# DURHAM *v.* SEYMOUR.

PATENTS ; BURDEN OF PROOF ; UTILITY AND NOVELTY ; ANTICI-
PATION.

1. In a suit in equity against the Commissioner of Patents brought
   under Sec. 4915 R. S. U. S., by a party whose application for a
   patent has been rejected by the Commissioner, to compel its
   issuance, the complainant is confined to claims presented in the
   Patent Office, and additional claims presented after the com-
   mencement of the equity suit will not be considered.

2. The burden of proof is always upon the applicant for a patent to
   show the patentability of his alleged invention.

3. An invention must be novel as well as of utility to make it patent-
   able.

4. A patent will not be issued for an invention covered by a former
   patent, especially to the former patentee, although the terms of
   the claims may be different ; and a second patent can be sus-
   tained only where it may cover matter described in the first,
   essentially distinct and separate from the invention covered
   thereby.

5. The claims in an application for a patent for improved drainage apparatus for buildings *held* to be covered by former patents (Nos. 235,754 and 258,391), issued to the same applicant, and anticipated by other American and English patents.

No. 401.    Submitted Jauuary 24, 1895.    Decided April 1, 1895.

HEARING on an appeal by the complainant from a decree dismissing a bill to compel the Commissioner of Patents to issue a patent to complainant. *Affirmed.*

The COURT in its opinion stated the case as follows :

This is an appeal from a decree of the Supreme Court of the District of Columbia, dismissing a bill filed by complainant, Caleb W. Durham, January 11, 1893, against the Commissioner of Patents, under the authority of section 4915 R. S., to compel the issuance of a patent for an improved drainage apparatus for buildings.

The proceeding to obtain a patent for the alleged invention was begun by filing an application in the Patent Office January 10, 1885, in which the following claims were made :

" 1. A drainage apparatus for buildings, consisting of pipes and fittings secured together by screw joints, substantially as and for the purposes specified.

" 2. Water-closet fittings which terminate in an adjustable screw-neck flange for the attachment of the hopper, substantially as and for the purpose specified.

" 3. The combination, substantially as before set forth, of the soil pipe, the flashing, and the tapped collar."

This application was amended February 8, 1887, and the claims of invention were increased in number to twenty-four.

The proceedings in the Patent Office show repeated rejections and amendments of claims until, reduced to seven, they were rejected by the primary examiner. An appeal was taken from his decision to the examiners in chief, who affirmed it November 19, 1889. This was in turn affirmed

on appeal to the Commissioner, April 29, 1890. Applicant then presented a motion for rehearing in order to again amend his claims before the primary examiner. This was granted and the application was amended so as to show three claims as follows:

" 1. The herein described drainage apparatus for buildings and the like, consisting of a drain pipe, a vertical soil pipe, and branch pipes, all of wrought metal and having cast fittings, said parts being united by screw-threaded joints, and forming, when screwed together, a rigid and continuous structure which will remain intact throughout its entire length, being supported from some part of the building as the conditions thereof may require.

" 2. As an improvement in drainage apparatus having an inclined drain pipe and composed of a series of threaded interchangeable parts, the running trap B herein described, provided with two inclined parallel threaded openings, as $b'$, to receive the threaded ends of inclined sections of said drain pipe, and two similar vertical openings in the top of the trap, one to receive a perpendicular air inlet pipe and the other for use as a handhole, as set forth.

"3. As an improvement in drainage apparatus composed of a series of parts united by screw-threaded joints, the inclined threaded branch pipe, the cast fitting F having an inclined threaded opening to receive the threaded end of said branch pipe at a rising grade, and a second larger threaded opening at its upper end, and the separable screw neck flange F' threaded on its external surface and entering said enlarged end of said fitting, as set forth."

These were likewise rejected by the examiner, whose decision was affirmed on appeal to the examiners in chief and Commissioner successively. Appeal was then taken to the Supreme Court of the District of Columbia, where the Commissioner's decision was affirmed June 13, 1892.

The bill sets out the proceedings in the Patent Office sufficiently to show jurisdiction under Section 4915 R. S., and " prays that the said adverse decision may be reversed, and

that this court order that he be adjudged and declared entitled to letters patent for his invention as set forth in said application, or of such part or parts thereof as, upon due consideration, may be found patentable," &c.

During the taking of testimony complainant gave notice that upon the hearing he would ask the court to consider the following claims in addition to those contained in the application referred to:

" 4. In a drainage apparatus, the combination with a soil or drain pipe of the fitting E.

" 5. In a drainage apparatus, the combination with the soil or drain pipe of the trap B.

" 6. In a drainage apparatus, the combination with the soil or drainage pipe of the fitting D connected therewith.

" 7. In a drainage apparatus, the combination with the soil or drain pipe of the fitting F connected therewith.

"8. In a drainage apparatus, the combination with a soil or drain pipe composed of metal sections united by fittings and forming a rigid structure which will remain intact, being supported from some part thereof, of a branch pipe adapted to support a water closet.

"9. In a drainage apparatus, the combination with a soil or drain pipe composed of metal sections united by fittings and forming a rigid structure which will remain intact, being supported from some part thereof, of a water closet fitting receiving support therefrom independent of the building in which it is placed.

"10. In a drainage apparatus, the combination with a soil or drain pipe of the fitting E and trap B.

"11. In a drainage apparatus, the combination with a soil or drain pipe of the fitting E and fitting D.

"12. In a drainage apparatus, the combination with a soil or drain pipe of the fitting E and the fitting F."

The original application was rejected in the Patent Office for want of patentable novelty, and chiefly on the ground that it was covered by a former patent to Durham for a drainage apparatus, No. 234,754, of December 21, 1880,

and another for elbow fittings for drainage pipes, No. 258,391, dated May 23, 1882, and also anticipated in other particulars by patents to others, both American and English. The testimony of a number of eminent experts was introduced by complainant in support of his claim of invention. The only evidence on behalf of the Commissioner consists of the patents referred to.

The specifications upon which the pending application is based are as follows:

"My invention relates to drainage apparatus for buildings and the like, and the novelty consists in the arrangements and adaptability of the parts, and in the construction of an air and water tight apparatus as an independent structure. It has only been known within a few years that the principal object to be attained in a drainage system, after the main purpose of providing a conduit for the sewage was secured, was to make gas-tight joints that would be unaffected by the usual influences to which such apparatus was subjected. In December, 1880, I received U. S. Letters Patent No. 235,754 for an apparatus which by the use of wrought iron pipe and cast fittings was rendered independent of vertical support from the building, and remained intact and unaffected by any usual rocking or settling thereof. In the specification of that patent, I pointed out the inherent defects in the drainage apparatus then usually employed, and since that time there has been little advance in the state of the art. The apparatus described in the patent above named has gone into extensive use, and experience in its manufacture and discoveries made by me since that time, have resulted in my making the improvements and inventions which are the subject of the present altercation. In practice, I found that it was not only desirable to make a gas-tight apparatus which would retain its integrity if adequately supported from below the soil pipe, but that it was necessary to construct an apparatus which should retain its gas-tight quality if it received adequate support for its weight at any point, and would be rigid and self-sustaining

as a whole ; in other words, to make an entire apparatus an independent structure in itself, and which might be supported from one floor or the roof of a building, or from beneath the soil pipe by the earth or by an independent pier or piers and under all such conditions be capable of remaining integral and gas-tight, and entirely unaffected by usual conditions. This result was attained only after a long and costly series of experiments and tests, and it became necessary to redesign some portions of the apparatus, and to so modify others as to make a structure entirely novel in view of the result sought to be accomplished. Steam fittings which naturally suggested themselves in this connection, were found to be unsuitable, as they were not designed for my purpose and were not strong enough and required other modifications in details which will be hereinafter described in connection with the drawing hereto annexed. I likewise found that outside of large cities, it was practically impossible to obtain proper workmanship to secure the erection of my apparatus in the proper manner and I found it necessary to invent some method by which the apparatus could be readily and easily erected by unskilled labor. Usually the efficiency of a drainage system depends more upon the honesty and skill of the workmen who erect it than upon its own excellence of design or fitness for its special purpose. With this end in view, I conceived the idea of making the pipe and fittings to be used in my apparatus of standard size, so that the parts so made would be interchangeable. The strength of the various parts was calculated anew, the soil pipe made in sections and cut with threads of standard size, was designed sufficiently strong to support any weight that could be placed upon it in the relations in which it would be used ; the cast fittings and branch pipes and other smaller parts of the apparatus were likewise made so that they in turn could uphold and sustain the weight of the soil pipe and its connections. The relatively great strength of well made wrought and cast iron enabled me to design the apparatus in proportions

which did not offend the eye and yet permitted the use of a comparatively high factor of safety. By having the work of cutting the screw threads, and the like, done in a finely equipped machine shop under the supervision of a trained engineer, I secured the result sought and obtained a drainage apparatus which could be completely prepared in the place of manufacture, safely shipped to a distant place and erected by unskilled workmen, the parts fitting so accurately that it was practically impossible to put them up improperly, and the strength of the parts securing all the desirable qualities above enumerated. When made as indicated, my apparatus forms an independent structure, as though it were made of one piece of metal, the tube having a smooth interior surface without obstacles, gas-tight and maintaining the rigid relation of its parts under any usual strain. I am well aware that attempts have been made to construct a drainage apparatus out of wrought iron pipe and steam fitter's castings, but it lacks the unity of purpose and efficiency of result secured by my specially designated fittings, and most of them present interior depressions and require some connections not made with screw joints.

" In the accompanying drawings the same letters of reference indicate similar parts in all the figures, and Fig. 1 represents a side elevation of my improved drainage apparatus, parts of the buildings being in section. Figs. 2, 3, 4, 5 and 6 represent details specially referred to hereafter. In the drawing, A represents an air inlet pipe for admitting fresh air to the drainage apparatus from a point outside of the building. The open end is guarded by a grating $A^1$, screwed into an adjustable coupling, $A^2$, of the pipe shown in detail in Figs. 3 and 4, and the lower end is screwed into the cast iron running trap B. The running trap B is a water seal against the passage of foul air from the sewer into the drainage apparatus; it is provided with four threaded openings, one vertical and one horizontal at either end; the horizontal openings $b'$ receive the threaded sections of the drain pipe J and the openings $b$ in one instance

receive the air inlet pipe and in other acts as a cleaning hole and is closed with a screw plug. The openings to receive the drain pipe are so tapped as to permit of a grade or fall in the line of the drain, while the opening to receive the air inlet pipe is usually adapted to permit that pipe to be erected vertically. In the case of this cast fitting, as well as the others which we shall hereafter describe, an inner shoulder is cast in the fitting, so that when united to the pipe a flush and continuous inner surface is obtained. The thread which unites the pipes and the castings are likewise cut with a slight taper so that the farther they are screwed together the tighter the joint becomes, while handholes are made in all the castings at every change of direction, permitting an easy examination at all points where stoppage of the flow is liable to occur. The cast elbow C has a threaded opening tapped at a grade to receive the drain J, and another threaded opening to receive the soil pipe K. Cleaning hole C is closed with a screw plug. The cast fitting E is a water closet " T " with a threaded opening $e'$, tapped at a grade to receive the branch pipe, with the upper and lower openings to receive the sections of the soil pipe, and a small opening $e$ to receive a waste pipe from a bath tub or bowl or the like. D is a cast water closet trap for use under a closet which requires a trap beneath the floor. It is provided with a threaded opening tapped at a grade to receive the branch pipe, a smaller opening $d$ to receive a vent pipe, and a cast flange $D'$ to which the closet is attached by set screws. It is separable from the casting D and is threaded so that a nipple of any length may connect it with D, thus enabling it to be used where the casting D could not alone be placed owing to the narrow space between joists. When the fittings E, D and $D'$ are properly connected together, the plane of the surface of the flange $D'$ will be at right angles to the line of the soil pipe, notwithstanding the rising grade of the branch pipe. The cast iron elbow F and the flange $F'$ shown in Figs. 1, 5 and 6, are for use where the water closet does not require a trap

beneath the floor, and is specially adapted where the joists are close and shallow.   The elbow F has a lower threaded opening to receive the branch pipe at a rising grade and an upper threaded opening of larger diameter into which the neck of the flange F', the outside of which is threaded, adapted to receive the water closet which is clamped to it, is screwed.   The cast iron " Y " branch G is provided with three threaded openings, an upper and lower one to receive the soil pipe and a side opening to receive a vent pipe.   The soil pipe projects through the roof of the building, and is left open or provided with a scowl or basket, as shown in Fig. 2.   Where the pipe projects through the roof, a neck of lead or tin flashing placed around it is joined to the roof by means of any suitable water tight connection.   A collar H is screwed on the soil pipe so as to overlap or embrace the upper edge of the flashing and prevent leakage down the soil pipe.   The collar H is provided with a thread cut rather large, so as to screw down on the soil pipe far enough to allow of a coupling above it.   It is obvious that the air inlet pipe and the drain pipe may be continued outward from the building to any convenient place, and that any number of drain pipes, soil pipes and connections may be used without departing from the principles outlined above. My drainage apparatus being specially adapted for the use to which it is put, and being strongly made, with gas tight joints, and capable each part of sustaining the others and being able to resist all ordinary strains, it requires little or no repair, and being made as it is it can be sold to be put up in a distant place with almost the same ease as staple commodities."

*Mr. J. Nota McGill, Mr. Don M. Dickinson* and *Mr. William R. Baird* for the appellant.

*Mr. Levin H. Campbell* for the Commissioner of Patents.

Mr. Justice SHEPARD delivered the opinion of the Court:

The first question for consideration is the error assigned upon the action of the court below in confining complainant to the three claims finally presented for the action of the Commissioner of Patents, and in the consequent refusal to consider the nine additional claims of which notice had been given before the hearing. The contention of complainant is, substantially, that he is not bound or concluded by his action in presenting but three of his claims for adjudication in the Patent Office, because this is a new and independent proceeding in equity, to be conducted according to the ordinary procedure in the courts thereof, and hence that he is now entitled to claim every and anything that might be disclosed by the specifications of his application or any part thereof. In this view we cannot concur.

The right to file the bill is conferred by Section 4915 R. S. by these words: " Whenever a patent on application is refused, either by the Commissioner of Patents or by the Supreme Court (now Court of Appeals) of the District of Columbia upon appeal from the Commissioner, the applicant may have remedy by bill in equity ; and the court having cognizance thereof, on notice to adverse parties and other due proceedings had, may adjudge that such applicant is entitled, according to law, to receive a patent for his invention, as specified in his claim, or for parts thereof as the facts in the case may appear."

In *Butterworth* v. *Hoe*, 112 U. S. 50, 62, it was said that the proceeding authorized by the foregoing section was not a technical appeal like that given in section 4911, and could be heard upon all competent evidence introduced therein. This is all that was actually decided in the case specially relied on by appellant, *Ex parte Squire*, 5 Ban. & Ar. 133. In *Gandy* v. *Marble*, 122 U. S. 432, 439, it was said that although the proceeding is not a technical appeal from the Patent Office, " Yet the proceeding is, in fact and necessarily, a part of the application for the patent ;" and it was consequently held that a delay of more than two years in filing the bill, after the last action upon the application had

in the Patent Office, was fatal under the provisions of section 4894.

The reasoning in support of the appellant's contention is founded largely in the assumption that a person may file his application, describing his supposed invention in general terms and making any general claim or claims, and that thereupon it becomes the duty of the authorities of the Patent Office to discover just what the applicant's invention really is, in its fullest scope and effect, and award him a patent therefor. Whatever may have been the policy of the early statutes in this regard, the assumption is clearly opposed to that declared in the revision of the patent laws in the act of 1870, the effect of which was to impose upon the applicant the duty of ascertaining, pointing out and claiming what he supposed his invention to be. Section 4888 R. S., which governs the application, expressly adds to the language of the former act, that " he shall particularly point out and distinctly claim the part, improvement or combination which he claims as his invention or discovery."

The purpose of this change in the statute is well stated by Judge DALLAS, as follows: " The practice of the profession and the opinions of the judges, to which I have adverted, had suggested that the embarrassments attendant upon the efforts of the courts to construe vague and indefinite patents might, without doing injury to patentees, be much alleviated by denying protection for anything, though original, new and useful, which was not also distinctly claimed. In brief, it was prescribed that the claim must be taken as defining precisely what the invention covered by the patent is, and hence the true question is not what the patentee might have claimed, but what he has claimed, the latter, not the former, being made the measure of his right. The rules for determining what is claimed in any case are few and simple, and are not peculiar to the patent law except as respects the doctrine of liberality in construction in favor of pioneer inventors. * * * It is sufficient to say that if the language of a claim has a plain and distinct meaning,

that meaning must prevail.    That which is to be ascertained is, of course, the intent of the claimants, not, however, that intent as elsewhere or in some other manner disclosed, but as expressed in the claim itself." *Durand* v. *Green*, 67 O. G. 814.

The law imposes upon the applicant the duty of looking after his own interest.    The Commissioner and his subordinates are charged with the protection of the interests of the public, while treating the applicant with fairness and liberality.    This seems to be the conclusion of the Supreme Court in *Miller* v. *Brass Co.*, 104 U. S. 350, 354, where Mr. Justice BRADLEY said: " It was probably supposed that the patentee would never err in claiming too little.    Those who have any experience in business at the Patent Office know the fact that the constant struggle between the office and the applicants for patents has reference to the claims.    The patentee seeks the broadest claim he can get.    The office, in behalf of the public, is obliged to resist this constant pressure."

When the appellant filed his application and specifications he made his claims thereon.    These he changed from time to time during the many years spent in trying to obtain a patent, amending his application also to meet the objections of the examiners.    He was under no obligation to conform to these objections or to abate any part of his claim.    He had his election to stand by his specifications and claims, and to demand a decision thereon as presented, with the right to appeal therefrom, if adverse, to the court, directly as provided in section 4911, and indirectly through bill in equity under section 4915 ; or to amend his application, alter his specifications, and abandon any part or parts of his claims based thereon.    It is a rule of general application, though not without its exceptions, that one who has two separate and distinct remedies is barred of his pursuit of one by his election to pursue the other.

If, after all these amendments, he had overcome the objections made by the examiner and received a patent on the

three claims finally relied on, the patent would have covered them, and nothing more. ·*Roemer* v. *Peddie*, 132 U. S. 313, 317. " The claim of a specific device or combination and an omission to claim other devices or combinations apparent on the face of the patent, are, in law, a dedication to the public of that which is not claimed. It is a declaration that that which is not claimed is either not the patentee's invention, or, if his, he dedicates it to the public.": *Miller* v. *Brass Co.*, 104 U. S. 350, 352. See also *Miller* v. *Eagle Co.*, 151 U. S. 186, 202 ; *Deering* v. *Winona Harvester Works*, 155 U. S. 286, 296.

Having elected to amend again and again and finally to stand upon the three claims which were rejected, we think that the abandonment of all else is as complete as if he had succeeded and received his patent thereon. It is that application, with those claims only, upon which his patent must issue if successful here. Nothing else has been refused him in the Patent Office. The decision of which he complains and which authorized him to institute this proceeding is upon them alone. Our construction of this statute finds some support also in a recent case in the Supreme Court of the United States, where the proceeding under section 4915 is likened to a suit to set aside a judgment. *Morgan* v. *Daniels*, 153 U. S. 120. And it would indeed seem to be a proceeding in the nature of a bill of review more than anything else.

In support of their contention, counsel for appellant have referred us to the history of the act of 1870 in Congress, as shown by the various amendments, the reports of committees, and the remarks made by the chairman of the Patent Committee, Mr. JENCKES, on the final passage. Had section 51 of the original bill remained, our view might have been different; but it was stricken out by the Senate and the House concurred. In the case of *Bate Refrigerating Co.* v. *Sulzberger* 157 U. S., 1, decided since the submission of this cause, the Supreme Court of the United States, responding to a like reference to the history

of the bill in Congress, and speaking through Mr. Justice HARLAN, said: "Nor can we assume that the House of Representatives, much less the Senate, based their action upon the opinion of individual members of the House as to the scope and legal effect of the report of the revisers. Comparing the bill reported by the revisers and the bill reported by the House Committee on Patents, with the act as it passed, we find it impossible to sustain the view taken by plaintiff."

We conclude therefore that the court did not err in refusing to consider the additional claims as properly before it, and that the case must be determined upon the three claims only which were finally passed upon in the Patent Office.

It remains now to consider whether the claims before us show patentable novelty; that is, whether they disclose an invention, in the sense of the patent law, of something both useful and new in the art of house drainage. The burden is upon the complainant to establish the affirmative by proof that is clear and conclusive. *Morgan* v. *Daniels*, 153 U. S. 120. And this must not be overlooked in considering the evidence in its several independent parts and as a whole.

The case of complainant is strongly supported by the testimony of some distinguished experts in sanitary engineering, who controvert the references made by the expert examiners of the Patent Office as well as their conclusions thereon. We have no reflections to make upon expert testimony. It is often satisfactory and sometimes necessary in the elucidation of questions of science and art; and so far as the experts in this case have given us the history of the progress of the art of house drainage and other facts and have explained the purposes and operations of the different appliances, devices and fixtures for use therein, we have given much weight to their testimony. But, what is an invention, or a patentable novelty, is a question of mixed law and fact, and hence the opinions of these witnesses, no matter how learned and able in their own professions, cannot be

given so much weight in its solution, much less substituted for the judgment of the court thereon.

The testimony lays great stress upon the defects in the old methods of house drainage, the years devoted by Durham to their improvement, the purposes and objects which he had in view, the devices used, and the final combination by him of materials, fittings and devices through which he has given to the public a useful, safe, economical and easily constructed system of house drainage vastly superior in its efficiency to any system or combination ever used before. It is in great part upon the utility of the new system, the general recognition thereof by sanitary engineers, and the consequent general use into which it has gone, that the experts base their opinions with respect to its being an invention.

The difficulties which lie in the way of determining what is an invention, and the impossibility of establishing a general definition applicable in all cases, are well stated by Mr. Justice BROWN, in *McClain* v. *Ortmayer*, 141 U. S. 419, 426. He says, among other things, that, "to say that the act of invention is the production of something new and useful does not solve the difficulty of giving an accurate definition, since the question of what is new, as distinguished from that which is a colorable variation of what is old, is usually the very question in issue."

It is the very question for determination in this case. Conceding that Durham has produced something of very great utility, does not determine his case; it must also be something new. He must show its patentable novelty with clearness and certainty. The combination of novelty with utility is essential in the patent law. *McClain* v. *Ortmayer*, *supra*. In that case it was also said: "The extent to which a patented device has gone into general use is an unsafe criterion of its actual utility." It is true that in the construction of a patent the immediate general use into which its subject matter has gone has often been considered sufficient to turn the scale in doubtful cases in favor of the

existence of invention. *Topliff* v. *Topliff*, 145 U. S. 156; *Krementz* v. *S. Cottle Co.*, 148 U. S. 556, 560. But it is evidence only, and has no weight at all except where the question is otherwise in doubt, and then has very little on a question of patentable novelty. *Grant* v. *Walter*, 148 U. S. 547, 556; *Duer* v. *Cabinet Lock Co.*, 149 U. S. 216; *Olin* v. *Timken*, 155 U. S. 141, 155. Another thing to be borne in mind, and which to some extent, it seems to us, is ignored by the experts, is that a principle, an idea or a purpose is not the subject of a patent. "The invention covered thereby must consist of new and useful means of obtaining that end. In other words, the subject of a patent is the device or mechanical means by which the desired result is to be secured." *Knapp* v. *Morss*, 150 U. S. 221, 227.

The record shows, and the same will be particularly referred to later, that a patent for a drainage apparatus was issued to Durham in 1880, and another for an improved elbow fitting for use therein was issued to him in 1882. The application in this case, being for a like subject matter, must be considered also in the light of another well established rule, which is, that no patent can be issued, especially to the same patentee, for an invention actually covered by the former, although the terms of the claims may be different; and that a second patent can be sustained only where it may cover matter described in the first, "essentially distinct and separate from the invention covered thereby." *Miller* v. *Eagle Mfg. Co,*, 151 U. S. 186. In that case it was also said: "It is settled that one inventor may make a new improvement in his own invention, of a patentable character, for which he may obtain a separate patent; and the cases cited by the appellee come to this point, and to this point only, that a later patent may be granted where the invention is clearly distinct from and independent of one previously patented." It was said also in another case: "Courts should regard with jealousy and disfavor any attempts to enlarge the scope of an application once filed, or of a patent once granted, the effect of which would be to

enable the patentee to appropriate other inventions made prior to such alteration, or to appropriate that which has, in the meantime, gone into public use." *Railway Co.* v. *Sayles*, 97 U. S. 554, 563.

Turning now to the testimony, it appears that the idea of removing sewage from buildings was old. The systems in use were defective and dangerous for want of proper appliances to prevent leakage of gas. The minds of many were directed to improvements therein, as the records of the Patent Office in this country and Great Britain disclose. Complainant testified that he was educated as an engineer and has made a specialty of house sanitation, having great experience therein. He says that in Chicago, where he resided in 1879, " the usual practice was to use a combination of earthenware, lead and cast iron pipes, and the drainage apparatus commonly used consisted of a ' pan ' water closet set upon the floor to which it was screwed. Beneath this was a lead trap which connected at its lower extremity with a vertical soil pipe, having what is called a bell mouth at its upper end, and was soldered thereto or cemented ; the lower end of this cast iron pipe was set in an earthenware drain made in short sections, which was tight or not, depending upon the skillfulness or integrity of the person who erected it." This apparatus was fastened in or to the wall of the building and depended thereon for its support.

Complainant's first improvement upon the old methods was secured to him by patent No. 235,744, dated December 21, 1880. The essential point then was, he says, to secure a support for the system of pipes and fixtures independent of the building, to prevent breaks and leakage caused by the settling of the building, which was common in Chicago on account of the peculiar character of the soil. In order to secure a rigid structure that would be self-supporting, he used steam fittings with two exceptions, and he says of these two fittings : " It is especially important to notice that these had no screw joints." " The device secured to me by that patent consisted of a main drain of iron pipe with

the several sections united by bolts passing through flanges; on this drain as a foundation, the soil pipes were erected." This was supported on a foundation independent of the building, and the ventilation was effected by a pipe connected with the drain and extending up through the chimney flue so that heat would aid the ventilation. The drawing of this first invention shows the rigid pipes, joined by steam fittings, with round elbow screw fittings for branch pipes. The drain pipe is inclined from the junction with the soil pipe to the sewer and has a running trap with two handholes which run obliquely into the pipe at the top of the trap, one on each end. Between this trap and the soil pipe junction the ventilating pipe is inserted. The drain pipe is made in sections with flanges fastened together with bolts. The soil pipe is connected by screw fittings. The drawing and specification showing the claims in controversy give the same rigid soil pipe upon its independent foundation, with branch connections at an acute instead of a right angle. The fittings are all screwed into threads specially made and so arranged as that the diameter of the pipe at each connection remains unchanged. The drain pipe is also connected by screw threads instead of with flanges and bolts as in the old. The connection between the soil pipe and drain pipe is a long curved elbow so shaped as to retard the flow as little as possible. The running trap has the handholes extending vertically into each end of the trap. One of these is covered by a screw top and in the other, and inside one, is fitted the end of a ventilating pipe which extends to an opening outside the house, receiving fresh air which is carried upwards and out through the soil pipe, which extends through the roof.

When called upon on his own behalf to explain the differences between his old and new apparatus he named five points : (1) A difference in function in the substitution of the fresh air ventilation for the hot air pipe. (2) Difference in parts in the substitution of fittings of long curvature, especially designed, for the steam fittings of short curvature.

(3) Difference in detail in adding the new fittings for connections which, screwed in with threads specially adapted therefor, have the same inner diameter of the pipe, with a curvature allowing a proper fall or descent from horizontal pipes into the vertical soil pipe. (4) The new apparatus is more easily erected by unskilled workmen who can screw the parts together as numbered. (5) Increased economy because the parts can be made at the factory and put together by unskilled workmen.

To do complete justice to the claim of appellant we will give his own elaborate and evidently carefully prepared answer to the question of his own counsel as follows :

" Q. Please state to the court what are your reasons for believing that your new apparatus, as compared with the old one or with the prior state of the art, at the time it was invented by you, constitutes an invention ?—A. In the production of a drainage apparatus which should be satisfactory to me, and which should perform the functions properly, I found that the ends to be attained were that the removal of the sewage, when it once commenced, should be uninterrupted ; that the structure in which it takes place should be incapable of rupture while in place, and that it should be properly ventilated. I claim to be reasonably skillful in my profession, and I spent many years in attempting to produce a structure which would fulfill these requirements. I first attempted to use steam fittings and steam pipes to accomplish my purpose, as shown in the apparatus described in my former patent, and while I did not altogether use screw joints in that patent, I was aware that pipes and fittings might be so united and could probably produce a structure more nearly gas tight than one formed by joining adjacent flanges. The apparatus constructed by me and described in that patent failed to meet the requirements that I speak of in a satisfactory manner. The interior of the conduit formed by the combination of pipes and their connecting parts was not uniform, and the stoppage of the flow of sewage therefore liable to occur. The

steam fittings used were also made with square angles, so that I found it unsatisfactory to use them. The structure, moreover, was weak at the flanged joints, and such method of joining was too costly. The scheme of ventilation also was difficult to apply; it involved the use of a hot flue and drew the gases down through the house instead of upward, as preferred by sanitary experts. The apparatus described in that patent was widely illustrated and discussed in the technical journals and its durability and efficiency considered by the profession. It certainly marked an immense advance in the art, as it had been previously practiced. Under these circumstances, and while I was endeavoring by the exercise of mechanical skill, and such engineering knowledge as I possessed, to perfect this device, it suddenly occurred to me, as I have before stated, that by making the parts of the apparatus interchangeable, in order to secure ease of construction and erection, by having threaded connections, in order to secure tightness and strength, by designing fittings especially adapted for the exigencies of house drainage, and by ventilating the apparatus thus made from the bottom upward, instead of from the top downward. and finally by making this entire structure so strong and durable that it would form an integral whole which could not be caused to leak by the external application of any strain that would not destroy the building itself, that I would meet all the requirements of the problem in a manner satisfactory to myself. I subsequently discovered that I had obtained in the construction of this apparatus two great additional advantages, viz.: economy in construction, and subsequent freedom from repair. In my opinion, this idea, coming to me by a sudden flash of thought, and instantly solving a problem which had been before my mind for years, did not constitute the mere exercise of technical skill or the mere application of excellence of workmanship, or the mere adaptation of an old thing to a new purpose, or the mere substitution of new materials to old analogous uses, but did constitute an exercise of that higher

faculty of the mind, which is termed invention. Of course, being vitally interested in the result of this litigation, I have examined with great care and intense interest the argument made by the Patent Office adverse to this conclusion, and I have been the more amazed at their position, because I have been continually astonished at the slight and trivial results of the lowest degree of mechanical skill for which patents have been granted."

Before proceeding to the further consideration of the three claims upon which the application must be granted or denied, it is necessary to eliminate one important element in complainant's apparatus. As we have seen, he claims a difference in function between the new and old apparatus based on the radical change made in the ventilation method and devices. This is undoubtedly a great improvement in the direction of safety, efficiency and economy. It constitutes a very important part of the new system, and it may be granted, sustains the claim of difference in function between the old and new apparatus. But this does not help complainant's case because it was not invented by him. When his attention was called to the mode of ventilation provided in the patents to Sargent, McDermott & Hyde, Mulligan and Pike, he said: " The citation of patents on trap and drainage ventilation is not relevant, because *I do not claim to have invented any new method of ventilation.*"

Some space may be saved without confusion by considering the first and second claims together. They are :

(1.) The general combination of drain, soil and branch pipes " all of wrought metal and having cast fittings, said parts being united by screw threaded joints, and forming when screwed together a rigid and continuous structure which will remain intact throughout its entire length, being supported from some part of the building as the conditions thereof may require."

(2.) The second is founded on an inclined drain pipe, a series of threaded interchangeable parts and a running trap in the drain pipe with two inclined threaded openings for

filling at each end and vertical openings at the trap, in one of which, on the house side, is screwed the fresh air ventilating pipe.

As we have seen heretofore, the patent of 1880 covers a rigid and continuous structure with cast fittings. This was supported by a foundation at the bottom independent of the building so as to avoid injury from the settling of the house. The drawings of the new structure show the same foundation as the old; but it appears that, as now manufactured, the support is obtained by attachment to floors of the buildings, which answer the purpose even better. Long before this, steam pipes had received their support in the same general way. In our judgment this change of mode of support, if novel, did not constitute invention; it was merely the product of mechanical skill.

If this conclusion needed support it would find it in the history of the case of the *Durham House Drainage Co.* v. *James Armstrong*, in the Circuit Court of the United States for the Southern District of New York, decided in November, 1888, the proceedings in which are in evidence. Armstrong was engaged in constructing the drainage of a tall building in the city of New York called Trinity Factory, and was sued in March, 1886, for infringement of complainant's 1880 patent. Complainant and his experts were positive in the assertion of the opinion that the whole structure was supported on a foundation at the bottom. It did not occur to them that the support was by fastening to the floors. But it was made clear that there was no support at the bottom at all; and that it was wholly in the fastenings of the branch pipes to each floor. Armstrong claimed nothing but mechanical skill in this manner of support and would seem to have anticipated complainant therein. (Compare original application of January 10, 1885, Record, page 125, with amended application copied herein above).

Taking up the differences in the parts employed in the two apparatus, " and in detail, in that new parts are added," as testified to by Durham, and, where these exist, resorting to

the other patents cited as references, we will consider them in order.

There is no invention in the substitution of one kind of material for another, as for instance wrought iron for cast iron, or in the substitution of a screwed joint for a flange and bolt connection. *Hotchkiss* v. *Greenwood,* 11 How. 248 ; *Hicks* v. *Kelsey,* 18 Wall. 670 ; *Florsheim* v. *Schilling,* 137 U. S. 64, 76. But if there were, we find these substitutions provided for in the patent of 1880. Turning to the specifications therein it appears that the waste pipe may be made either of wrought or cast iron pipe, and the different sections should be joined together with some kind of close or tight joints in order to prevent any leakage or escape of gases. If wrought iron pipe is used, the different sections or nipples are united with the ordinary screw or steam fitting joint. The foregoing disposes at least of so much of the conclusion of Waring and other experts, with respect to patentable novelty, as is founded in the premise that the new system "avoids the use of cast iron pipe. It has no bolted flanged joints. It is supported from any convenient part or parts of the building."

The new fitting of long curvature substituted for the common elbow steam fitting of short curvature was patented to Durham separately May 23, 1882 (No. 258,391). The drawing and specifications of that patent show and claim "the elbow screw fitting connecting the soil pipe with the main drain," and show further that "each of these screw fittings is made of the same interior diameter as that of the pipe or pipes connected, and are provided with an enlargement or recess at their ends in which the screw threads are cut." "My improved elbow fitting is specially designed for use with my drainage system heretofore patented to me, and in which iron drainage pipes *connected by screw fittings* and supported on foundations independently of the buildings, are employed." The manner in which the screw joints of this elbow are made and adjusted so as to preserve the continuous diameter of the pipe, thereby facili-

tating the flow and preventing the deposit of matter which formerly took place in the old steam fittings, is a very important and valuable feature or part of the improved system, on which great stress is laid by the experts.    But it was known long before it was utilized by Durham.    It is found in a patent issued to John Hoskin, December 15, 1874, for connecting the tubes used in artesian wells, and · in another to George H. Webster, May 8, 1877, for connections in pipes in house drainage.   The inclined drain pipe with running trap is shown in the drawing of the 1880 apparatus also, but with handholes running obliquely in the same instead of vertically as in the new.    In addition, Knight's patent, February 20, 1878, shows the running trap with vertical handholes at each end.    Stewart's, April 10, 1876, shows the trap with handhole in the middle of the curve and a ventilating pipe hole adjoining.    Pike's patent, December 30, 1884, shows the running trap in an inclined drain pipe with a handhole at one end and a fresh air pipe at the other, shown in the drawing to enter vertically.    Hornibrook's English patent shows practically the same drain, trap and hand and ventilating holes.

(3.) The third claim is for the apparatus composed of a series of parts united by screw threaded joints, the inclined threaded branch pipe, the cast fittings with inclined threaded openings to receive the threaded end of the branch pipe at a rising grade, and the second larger threaded opening at its upper end and the separable screw neck flange, threaded on its external surface and entering said enlarged end of said fitting, this latter being the connection into which was set or screwed the closet drain.

We have heretofore shown the want of novelty in the screwed joints of the device by which the continuous diameter of the pipes remain unbroken.   The connection of the water closet through means of screw joints and fittings was also old.   See patents to Craigie, May 11, 1869; to Dacey, June 29, 1869; Kernochan, July 24, 1877; and see also Denton's Sanitary Engineering, p. 73.

The connection of the inclined branch pipe with the vertical soil pipe at an acute angle, instead of at right angles practically, with the short elbow for steam fitting, as was the case in the old apparatus, is a very useful improvement thereon, and as regards that may be said to be new, but it is not new when considered in connection with others. The patent to McDermott & Hyde, February 12, 1878, shows the same descending branch connection with the soil pipe, and its second claim is for " a section of drain pipe having an inclined branch." Townsend's patent, July 5, 1881, shows the same inclined branch connection. The catalogue of the J. L. Mott Iron Works shows several designs of single and double Y connections with screw threads as manufactured for the trade.

The special claims laid by Durham in his own testimony to novelty in his branch pipe connections and fittings consist of the preservation of the continuous diameter of the pipe, and of the peculiar formation of the screw threads so as to screw tightly on to the branch pipe on its descending grade, the grade being determined thereby. Of the first ground it is needless to say more. As regards the second, our attention has been called to no similar cast iron screw fitting, unless, as seems highly probable, the same tapping of threads was necessarily used in the long curved fitting patented to Durham in 1882, by which the vertical soil pipe was connected with the drain pipe at something greater than a right angle by reason of its descending grade. It is a very useful contrivance in a complete apparatus for house drainage and adds greatly to the advantages of complainant's system. Even if not a part of his patent of 1882 or embraced therein, we are not, however, prepared to say that it rises to the dignity of an invention. "All improvement is not invention and entitled to protection as such. Thus to entitle it, it must be the product of some exercise of the inventive faculties, and it must involve something more than what is obvious to persons skilled in the art." *Pearce* v. *Mulford,* 102 U. S. 112 ; *Knapp* v. *Morss,* 150 U. S. 221, 227.

Having examined the different parts and devices in detail it remains to consider the effect of the combination as a whole.  A patent is not to be refused merely because the invention is the result of a combination of old devices. " But the result must be a product of the combination and not a mere aggregate of several results each the complete product of one of the combined elements.    *    *    * Merely bringing old devices into juxtaposition, and then allowing each to work out its own effect without the production of something novel, is not invention." *Hailes* v. *Van Wormer*, 20 Wall. 353, 368.

The following language of Mr. Justice MATTHEWS, referring to another combination claimed to be an invention, is directly applicable to the improved drainage system which we are here asked to order patented : " Beyond the separate and well known results produced by them separately no one of them contributes to the combined result any new feature ; no one of them adds to the combination anything more than its separate independent effect ; no one of them gives any additional efficiency to the others, or changes in any way the mode or result of its action.    In a patentable combination of old elements, all the constituents must so enter into it as that each qualifies every other ; to draw an illustration from another branch of the law, they must be joint tenants of the domain of the invention, seized each of every part, *per my et per tout*, and not mere tenants in common, with separate interests and estates.  It must form either a new machine of a different character and function, or produce a result due to the joint and co-operating action of all the elements and which is not the mere adding together of separate contributions, otherwise it is only a mechanical juxtaposition, and not a vital union." *Pickering* v. *McCullough*, 104 U. S. 310, 317 ; see also *Reckendorfer* v. *Faber*, 92 U. S. 347 ; *Glue Co.* v. *Upton*, 97 U. S. 3 ; *Hollister* v. *Benedict*, 113 U. S. 59, 72 ; *Thompson* v. *Boisselier*, 114 U. S. 3, 11 ; *Thatcher Heating Co.* v. *Burtis*, 121 U. S. 286 ; *Knapp* v. *Morss*, 150 U. S. 221, 227 ; *Market St. Cable Co.* v. *Rowley*,

155 U. S. 621, 629. In the last case a claim was rejected because " obviously within the principle, so often declared, that a mere carrying forward of the original thought, a change only in form, proportions or degree, doing the same thing in the same way, by substantially the same means, with better results, is not such an invention as will sustain a patent." See also *Roberts* v. *Ryer*, 91 U. S. 150; *Smith* v. *Nichols*, 21 Wall. 112, 119.

The cases of *Loom Co.* v. *Higgins*, 105 U. S. 580, and *Potts* v. *Creager*, 155 U. S. 597, relied on by appellant, are distinguishable from this case. The former was a case of a combination of the advantages of an old device, skillfully divested of some defects, with another. The result was to increase the capacity of the same loom from forty yards per day to fifty yards. The great utility of the invention commended it to the favor of the court, and it was held to fall within the rule thus enounced by Mr. Justice BRADLEY: " It may be laid down as a general rule, though perhaps not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result never attained before, it is evidence of invention."

In the latter (*Potts* v. *Creager*), the bill was for the infringement of a patent for a machine for disintegrating clay. The machine consisted of two revolving rollers, upon the periphery of one of which were set, in longitudinal grooves, a number of projecting steel strips, against which the clay was pushed by the other roller as it passed between the two. A number of machines were relied on as anticipations, such as for grinding wood pulp and grain, cutting fruit, hulling seeds, &c. The only machine enough like complainant's invention to require explanation by the court was one for polishing wood; all others were said to differ radically. The wood polisher had two rollers with strips of glass set in one in a manner similar to the steel strips in the complainant's machine, which polished the boards as they passed between the rollers. The machine did not work, and, in the language of the court, "appears

to have been merely an abandoned experiment." In deciding in favor of the invention much stress was laid upon the remoteness of the uses of the two machines. Mr. Justice BROWN, who delivered the opinion of the court, said: " If the transfer be to a branch of industry but remotely allied to the other and the effect of such transfer has been to supersede other methods of doing the same work, the court will look with a less critical eye upon the means employed in making the transfer." Again he said: "As a result of the authorities upon this subject it may be said, that, if the new use be so nearly analogous to the former one that the applicability of the device to its new use would occur to a person of ordinary mechanical skill, it is only a case of double use; but if the relations between them be remote, and especially if the use of the old device produced a new result, it *may* at least involve an exercise of the inventive faculty. Much, however, must still depend upon the nature of the changes required to adapt the device to the new use." It is quite evident that the remoteness of the uses of the two machines, with the acknowledged utility of the latter in its different field of labor, furnish the foundation of the decision.

In this connection must be borne in mind, too, the latitude of construction given to new invention and the strict and narrow construction invariably applied in a case where the claims are for the same general subject-matter, and especially where the same person is applying for a second patent. A case more nearly resembling complainant's, in our opinion, is that of *Thatcher Heating Co.* v. *Burtis*, 121 U. S. 286. Thatcher had obtained a patent for a heating stove which combined three old inventions into a new and improved use and sued for an infringement thereof. He took a base burning stove for insertion in a fireplace and combined the three elements : 1. A cylinder or body projecting outward from the mantel or frame of the fireplace having within it a fuel magazine or feeder with an opening through which the magazine can be fed from above. 2.

The extension of the magazine or feeder to the feed opening of the outer casing so that there may be no open space across which to project the fuel on feeding the magazine. 3. A feeder or magazine projecting above the top of the heater so as to increase the capacity of the same.

It was contended, on behalf of Thatcher, that he found a new use for the fuel magazine in its new situation, not obvious to those skilled in the art; that the fuel magazine was made to perform a new function, because never before used in such structures ; and that the parts of the combination co-operated to produce a new result, which consisted in securing and maintaining in fireplace heaters a uniform and steady heat that could be regulated for use in upper rooms at will, at the same time heating the room in which it was situated by means not requiring constant attention. The magazine extending its rim to the outer casing of the heater was, in fact, something new. Invention was denied him, though his claim was strongly supported by the testimony of experts. The magazine was old, but it was conceded that Thatcher made an advantageous location of it in the fireplace heater. The court adopted the following from the opinion of Judge WALLACE in the circuit court: "It must be conceded that it was not obvious that such a fuel magazine could be advantageously employed in such a heater. Attempts had been made by others to accomplish the same thing without satisfactory results, but Thatcher's organization was a success and immediately commended itself to the public. But Thatcher's broad claims cannot be sustained. There may have been patentable novelty in the means he employed to adjust the parts in the new organization, but there was none in merely bringing those parts together. They did not perform any new function in the new arrangement. * * * The parts do not co-operate to produce a new result. By their aggregation the new structure contains all the advantages which resided before separately in several structures. The new heater is, therefore, a better heater than any which preceded it, but it

D. C.]                Opinion of the Court.

does not present a patentable combination irrespective of the means employed to adjust the several parts into efficient relations to each other."

Notwithstanding the labor and industry of the complainant have produced a structure of great usefulness, we are constrained to hold that his claims are not patentable.

It follows that *the decree appealed from must be affirmed, with costs to the appellee; and it is so ordered.*